UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at COVINGTON

| | | |
|---|---|---|
| RANDALL COLEMIRE,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:23-134-DCR-CJS |
| v. | ) | |
| | ) | |
| LISA A. YEARY, et al., | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court on the Motion for Summary Judgment filed by Defendants Jailer Lisa Yeary, Deputy Michael Rigdon, Deputy Brandi J. Monroe, Deputy Terra Lennex, Deputy John Blake Guttridge, Deputy Andrew Fulton, Deputy Austin T. Bellew, and Chief Deputy Gerald Curtis. (R. 41). Plaintiff Randall Colemire, proceeding *pro se*, filed a Response to Defendants' Motion, and Defendants filed a Reply.[2] (*See* R. 46; R. 47). This matter has been referred to the undersigned for discovery and pretrial oversight, including preparing proposed findings of fact and recommendations on any dispositive motions. (*See* R. 16). For the reasons explained herein, it will be recommended that Defendants' Motion for Summary Judgment (R. 41) **be granted**.

---

[1]    Colemire's first name is spelled multiple ways in the record. (*Compare* R. 1 at Page ID 1 ("Randall Colemire"), *with* R. 1 at Page ID 9 ("Randell Colemire")); *see also Kentucky Online Offender Lookup,* http://kool.corrections.ky.gov/KOOL/Details/238511 (last visited January 24, 2025). The spelling used on the docket reflects what is contained on the first page of the Complaint. (*See* R. 1 at Page ID 1).

[2]    Colemire also filed a Response to Defendant[s'] Reply to Plaintiff's 1st Response to Defendant[s'] Memorandum in Support of Their Motion for Summary Judgment (R. 48), which filing the Court construes to be a Sur-reply. Defendants have moved to strike this filing. (R. 49). However, because Colemire's construed Sur-reply is brief and addresses a few points made in Defendants' Reply, the Motion to Strike will be denied by separate Order entered contemporaneously with this Report and Recommendation.

## I.    PROCEDURAL BACKGROUND

Colemire initiated this action in September 2023 by making a form filing to the Western District of Kentucky of a Civil Rights Complaint to be Used by a *Pro Se* Prisoner Under 42 U.S.C. § 1983 or Under *Bivens v. Six Unknown Fed. Narcotics Agents*. (R. 1 at Page ID 1). The Western District transferred the action to this District on venue grounds after its review revealed "that the events set forth in the complaint occurred in Mason County, Kentucky, which is located in the Eastern District of Kentucky." (R. 5 at Page ID 33).

Colemire's claims stem from an altercation he had with a fellow inmate (Michael Tyler Jordan) at the Mason County Detention Center, during which he was injured. (R. 1). Broadly speaking, Colemire alleges his constitutional rights were violated by jail officials when they placed him in the cell with Jordan and failed to intervene to prevent him from being injured and when they were deliberately indifferent to his medical needs. (*See generally* R. 10 (Chief District Judge Reeves's Order addressing Colemire's Complaint on initial screening under 28 U.S.C. § 1915(e)(2)). The Complaint named the following as Defendants in their official and individual capacities: the Mason County Detention Center ("MCDC"), Jailer Yeary, Chief Deputy Curits, Internal Affairs/Operations Administrator Rigdon, Staff Officer Monroe, Staff Officer Lennex, Staff Officer Guttridge, Staff Officer Fulton, and Staff Officer Bellew.[3] (*See* R. 1 at Page ID 2-3). Colemire requested a jury trial, and he sought money damages in the amount of $300,000, punitive damages in the amount of $300,000, and any and all other relief that the Court deemed appropriate. (*Id.* at Page ID 1, 8).

---

[3]    In subsequent references, the Court will use the titles Defendants use in their Motion for Summary Judgment: Jailer Yeary, Deputy Rigdon, Deputy Monroe, Deputy Lennex, Deputy Guttridge, Deputy Fulton, Deputy Bellew, and Chief Deputy Curtis. (*See* R. 41).

After the action was transferred to this Court, Chief Judge Reeves granted Colemire's request to proceed *in forma pauperis*.  (*See* R. 9).  Then, upon initial screening, Chief Judge Reeves dismissed Colemire's claims against MCDC as a facility, explaining that "[a] detention center is not a suable entity apart from the county that operates it" and observing that Colemire had further failed to state a valid claim against Mason County.  (R. 10 at Page ID 12).  Colemire's claims against the eight named employees, however, survived initial screening, and the United States Marshals Service was directed to personally serve those Defendants at MCDC.  (*See id.* at Page ID 12-13).

On December 7, 2023, the remaining Defendants filed an Answer to Colemire's Complaint.  (*See* R. 15).  In their Answer, Defendants admit certain facts, deny other averments, and raise various defenses to Colemire's claims.[4] (*See id.* at Page ID 211-14).  After the filing of Defendants' Answer, Chief Judge Reeves referred this matter to the undersigned "to conduct all further proceedings until the time of trial, including preparing proposed findings of fact and recommendations on any dispositive motions."  (R. 16 at Page ID 216).

The Court then entered a Scheduling Order, which was simplified in nature due to Colemire's *pro se* status.  (R. 18).  Under the Scheduling Order, the parties were to complete all pretrial discovery by June 10, 2024, and any dispositive motions were to be filed by July 10, 2024.  (*Id.* at Page ID 218-19).  Case deadlines were later extended to require discovery to be completed by August 12, 2024, and to require dispositive motions to be filed by September 12, 2024.  (*See*

---

[4]     In their Answer, Defendants state: "To the extent that the Complaint asserts claims against Defendants in their official capacity, Plaintiff has failed to allege that any Mason County Detention Center policy, custom or practice was the moving force behind the alleged violation of his constitutional rights." (R. 15 at Page ID 212).  This statement is accurate—to the extent any official capacity claims survived initial review, Colemire would be unable to obtain relief on such claims because he has failed to point to any policy or custom by Mason County that was the moving force behind any alleged constitutional violation.  *See generally Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).

R. 35). As part of the discovery process,[5] defense counsel was granted leave to take Colemire's deposition. (*See* R. 36; R. 42). During his deposition, Colemire explained that his filings were made by a legal aide at the institution where he is incarcerated. (*See* R. 42 at Page ID 357 ("I have a legal aide that views and files everything for me in here."); *see also* R. 42 at Page ID 376 ("[S]omebody filed all of these papers for me. I sat down and told them what happened, and this is where we're ending up.")).

On September 12, 2024, Defendants timely filed a Motion for Summary Judgment. (R. 41). Colemire responded to the Motion, and Defendants replied. (R. 46; R. 47). Thereafter, Colemire filed a Response to Defendants' Reply (R. 48), which is essentially a Sur-reply. *See supra* n.2. The matter stands submitted for review.

## II.    FACTUAL BACKGROUND

In November 2022, Colemire was housed at MCDC. (*See* R. 1 at Page ID 5; *see also* R. 15 at Page ID 211). Colemire testified that, at that time, he was being housed for a parole violation and "was a State inmate then." (*See* R. 42 at Page ID 363, 432); *see also Kentucky Online Offender Lookup,* http://kool.corrections.ky.gov/KOOL/Details/238511 (last visited January 24, 2025).

Colemire testified that, on the day of the altercation with Jordan (which was around November 30, 2022), peanut butter and Kool-Aid packets had been snuck into the inmates' laundry in the main cell where he and Jordan were housed; Jordan began to eat the peanut butter while saying it was his birthday, and Colemire tried to take the blame for Jordan for having the

---

[5]    During discovery, Colemire attempted to serve multiple subpoenas duces tecum. (*See, e.g.,* R. 22; R. 27). Through those efforts, Colemire sought to obtain video footage of the incident. The Court denied Colemire's formal requests for various reasons. (*See, e.g.*, R. 26; R. 37). Up until he filed his Response, Colemire maintained that he had never been provided with the video footage. (*See* R. 46 at Page ID 452 ("[T]he Defendants have failed to forward Colemire a copy of the video footage of the incident.")). However, Defendants represent the video footage was provided to Colemire. (*See* R. 44 at Page ID 443).

contraband.  (*See* R. 42 at Page ID 388-89).  Officers responded to the inmates having contraband and moved Jordan, and then Colemire, from the main cell to Cell 131.  (*See* R. 15 at Page ID 211; *see also* R. 1 at Page ID 5; R. 42 at Page ID 392).  Deputies Guttridge and Bellew transported Jordan to Cell 131 first, then Deputies Bellew and Fulton came back to get Colemire.  (R. 42 at Page ID 392).

Colemire maintains that Jordan was "a known mentally ill, combative inmate who warned staff not [to] place [Colemire] inside of the same cell with him."  (R. 23 at Page ID 237).  Colemire testified that Jordan had told Deputy Guttridge (when the door to Cell 131 was open during the inmates' move) not to bring Colemire into the same cell because there would be trouble.  (R. 42 at Page ID 391-92).  Colemire further maintains that Deputy Guttridge radioed Deputy Monroe and Monroe told Guttridge to put Colemire in the same cell as Jordan, despite the threats Guttridge heard.  (R. 23 at Page ID 238; R. 42 at Page ID 394-95).  Colemire submits that staff knew of the risk, but placed him in the cell anyway:

> The staff responsible for knowingly placing me within the cell with Michael Tyler Jordan, who was yelling & screaming to them, making threats, telling them not to place me within the cell with him acted as if there was somekind of bet or wager made upon my mere safety that Jordan would, in fact, attack me when they put me inside of the same cell with him[.]

(R. 23 at Page ID 238 (as in original)).  According to Colemire, Guttridge shoved him into the cell. (R. 42 at Page ID 395).

Once Colemire was in the cell with Jordan and the door was shut, Colemire asked Guttridge, "Did you not hear?" and then Jordan started to scream and punched Colemire.  (*Id.*). Colemire testified he was hit multiple times, but he was not sure by whom.  (*Id.* at Page ID 398). Colemire said he could feel other hands on him (*id.*) and that he could not see who was hitting him after Jordan threw the first punch (*id.* at Page ID 402).  To control the inmates, officers deployed

OC (pepper) spray and a taser.  (R. 15 at Page ID 211; *see also* R. 1 at Page ID 5-7).  Through his filings, Colemire alleges that staff waited to intervene.  (R. 23 at Page ID 239).

After the altercation,[6] Colemire resisted attempts to be placed in cuffs (*see* R. 15 at Page ID 211; R. 1 at Page ID 5), and he maintains that, when the officers were breaking up the fight, an employee slammed him to the ground and held him down, forcefully placing the weight of the officer's body onto his jaw and side neck area with the officer's bent knee as Colemire laid on the concrete floor.  (R. 23 at Page ID 237-38; *see also* R. 42 at Page ID 400 (Colemire describing officers' actions after the altercation)).  Colemire recalls being slammed into his personal property box and Fulton being the officer who handcuffed him.  (R. 42 at Page ID 402).  Colemire said he was then taken to the showers for decontamination by Lennex.  (*Id.* at Page ID 400-01).

During the altercation, Colemire's jaw, finger, and ear were injured.  (*See id.* at Page ID 414-15).  According to Colemire, the day after the incident, he had difficulty eating breakfast, so a jail nurse came to look at him.  (*Id.* at Page ID 410-12).  The nurse gave Colemire some medicine for the inflammation and requested an x-ray, so an x-ray technician then came to MCDC and took an x-ray of Colemire's jaw, "which was swollen beyond belief."  (*Id.* at 410-11, 416; R. 23 at Page ID 238; R. 23-1 at Page ID 249 (Radiology Report dated 12/01/2022); R. 23-1 at Page ID 264 (Southern Health Partner's Physicians Order dated 11/30/22 for "x-ray of mandible"); R. 42 at

---

[6]    During his deposition, Colemire stressed that the incident with Jordan was not a "fight":
   A  I need to clear one thing up.
   Q  Yes, sir.
   A  This might sound petty.  You keep saying "fight."
   Q  Yeah.
   A  To me, it wasn't a fight.
   Q  Got it.
   A  I never each threw a punch.  I wasn't trying to -- I was just trying to keep from getting hit more.
(R. 42 at Page ID 376-77 (transcript copied verbatim)).

Page ID 418 ("So within three days of the fight, I was x-rayed by the jail.")).  The x-ray showed Colemire's jaw was broken (R. 23-1 at Page ID 249), and jail medical staff requested outside consultation for the injuries the same day the x-ray was read (R. 41-2 at Page ID 348).  Colemire testified that he thought the jail nursing staff "did what they could do" and that "[t]heir hands are tied to a certain extent."  (R. 42 at Page ID 411).  He further testified that he was taken "to the hospital only after they brought an x-ray machine in and seen how bad of broke it was."  (*Id.* at 373-75, 411 (discussing visits to University of Kentucky Medical Center and Meadowview Regional Medical Center)).  Colemire testified imaging was done at the University of Kentucky Medical Center, where it was determined he needed surgery.  (*Id.* at Page ID 418).

At MCDC, Colemire's treatment involved being given "inflammatory medicine and a soft food diet until the operation."  (*Id.* at Page ID 417).  Colemire had surgery on his jaw on December 19, 2022.  (*See, e.g.*, R. 23-1 at Page ID 265 (After Visit Summary)).  Regarding injuries, Colemire describes his jawbone as being "basically shattered into pieces" and his mouth as being "deformed and permanently damaged."  (R. 23 at Page ID 240).  During the surgery, Colemire had plates and screws placed in his jaw.  (R. 42 at Page ID 420).  Colemire says he now has a huge scar across his jaw and underneath his neck, and he needs to use his finger to remove food particles from between his teeth and jaw-line inside his mouth after each meal.  (R. 23 at Page ID 240; *see also* R. 42 at Page ID 368).

## III.    STANDARD OF REVIEW

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56.  That Rule provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under Rule 56, once the moving party has met its burden, the burden

shifts to the nonmoving party to present "specific facts showing that there is a genuine issue for trial." *Arendale v. City of Memphis*, 519 F.3d 587, 593-94 (6th Cir. 2008) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

When ruling on motions for summary judgment, courts accept the nonmovant's evidence as true and draw all reasonable inferences in favor of the nonmovant. *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, to survive summary judgment, the nonmoving party cannot rely on "conjecture or conclusory accusations" but must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Arendale*, 519 F.3d at 605 (citing and quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). Conclusory assertions that are supported only by the asserter's own opinions cannot withstand a motion for summary judgment. *Id.*

## IV.    ANALYSIS

In his Complaint, Colemire alleges his constitutional rights were violated by jail officials when they placed him in the cell with Jordan, failed to intervene to prevent him from being injured, and were deliberately indifferent to his medical needs. (*See generally* R. 1). In their Motion for Summary Judgment, Defendants first argue that Colemire failed to exhaust his available administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (R. 41 at Page ID 333-35). In the alternative, Defendants argue they are entitled to summary judgment on the merits of Colemire's claims and/or to qualified immunity. (*See id.* at Page ID 336-45). The Court will address these arguments in turn.

### A.    The Prison Reform Litigation Act

8

The PLRA requires a plaintiff confined in any jail, prison, or other correctional facility to fully exhaust available administrative procedures before that plaintiff can file an action relating to his conditions of confinement. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also* 42 U.S.C. § 1997e(h) ("As used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."). This requirement of the PLRA is an affirmative defense that must be plead and proven by the defendants in an action. *See Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Jones v. Bock*, 549 U.S. 199, 212 (2007)). "A prisoner exhausts his remedies when he complies with the grievance procedures put forward by his correctional institution." *Id.*; *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]"). "[T]he PLRA's exhaustion requirement is designed to give prison officials a fair opportunity to address a prisoner's claims on the merits before federal litigation is commenced." *Mattox*, 851 F.3d at 592.

However, a prisoner is only required to exhaust grievance procedures that are *available*. *See Ross v. Blake*, 578 U.S. 632, 642 (2016). In this context, the Supreme Court has outlined "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."

9

*Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  *Id.* at 643-44.  "And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 644.

In this case, Defendants have raised the affirmative defense that Colemire did not comply with the PLRA because—contrary to MCDC policy—Colemire did not file a grievance regarding any jail employee's actions in relation to his allegations.  (*See* R. 41 at Page ID 333-35).  For his part, Colemire does not dispute that he never filed a grievance regarding any of the actions underlying this case.  (*See, e.g.*, R. 23 at Page ID 240 ("I never file[d] one.")).  Instead, he contends that there was no grievance procedure available to him and argues that:

> MCDC's grievance procedure operated as a dead end to Colemire.  First, MCDC Officials never once provided any documentation of their grievance procedure to their jailed inmates and in any event MCDC thwarted any kind of way a jailed inmate could navigate any grievance procedure when there was no kiosk machines in the segregation unit he was kept in five (5) days immediately after the assault.

(R. 46 at Page ID 453).

Upon full consideration of the record, the Court makes several observations that lead it to agree with Defendants' argument that Colemire has not complied with the PLRA's exhaustion requirements.  First, according to Jailer Yeary's affidavit, MCDC "publishes, implements and administers an inmate grievance policy," which "is published and provided to all inmates in an Inmate Handbook."  (R. 47-1 at Page ID 570; *see also* R. 41-1 (Mason County Detention Center Inmate Handbook)).  Second, although Colemire claims no grievance materials are provided to inmates, those assertions are belied by the fact that Colemire himself had *previously* filed a grievance while in custody at MCDC.  (*See* R. 41-3).  Third, and perhaps most problematic to

10

Colemire in terms of exhaustion, is the fact that he has pointed to no evidence showing he even asked officials for the opportunity to file a grievance. *See Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) ("This court requires an inmate to make affirmative efforts to comply with the administrative procedures, and analyzes whether those efforts to exhaust were sufficient under the circumstances.") (internal quotation marks omitted); *see also Bennett v. Mich. Dep't of Corr.*, No. 22-1863, 2023 WL 4678996, at *3 (6th Cir. July 21, 2023) (same).

On this record, granting Defendants' Motion for Summary Judgment on exhaustion grounds alone could be recommended. But even if Colemire had requested grievance materials and was thwarted by jail officials from filing a grievance (R. 48 at Page ID 573), thereby excusing the PLRA exhaustion requirement, his claims still fail on the merits for the reasons discussed below.

### B.    Constitutional Claims

Colemire brings his claims under 42 U.S.C. § 1983. (*See* R. 1). "To establish liability under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected or caused to be subjected to this deprivation by a person acting under color of state law." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000). In his Complaint, Colemire asserts violations of his rights under the Eighth Amendment of the United States Constitution and under Section 17 of the Kentucky Constitution. (*See* R. 1 at Page ID 6). The parties characterize Colemire as asserting failure-to-protect and deliberate indifference claims. (*Compare* R. 41, *with* R. 46). Before further analysis on these claims, the Court pauses to comment on the proper construction of them.

First, any claims by Colemire based on Section 17 of the Kentucky Constitution are not cognizable. As another District Judge of this Court has explained:

> Section 17 of the Kentucky Constitution prohibits the infliction of cruel punishment. Ky. Const. § 17.   The Kentucky Supreme Court has determined that Section 17 is virtually identical to the Eighth Amendment of the United States Constitution, and therefore, the analysis of such claims can be collapsed.  *Riley v. Kentucky*, 120 S.W.3d 622, 633 (Ky. 2003).  However, claims alleging violations of state-constitutional rights are "not cognizable under § 1983," which provides a cause of action only for violations of federally created rights.  *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005).  Nor is there an analogue to § 1983 under Kentucky law.  *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534-38 (Ky. 2011) (holding that neither the Kentucky Constitution nor any Kentucky statute "create[s] a private right of action for violations of the state constitution" and refusing to judicially create a constitutional tort for state-constitutional violations).

*Griffith v. Correcthealth Kentucky, LLC*, No. 0:15-CV-5-DLB-EBA, 2017 WL 3749775, at *5 n.3 (E.D. Ky. Aug. 30, 2017).  Thus, to the extent Colemire attempts to assert any cause of action for violation of Section 17 of the Kentucky Constitution, such a claim fails.  *Id.*

Second, the nature of Colemire's confinement in November 2022 must be addressed.  In particular, whether Colemire was a convicted prisoner (whose claims would be reviewed under the Eighth Amendment) or a pretrial detainee (whose claims would be reviewed under the Fourteenth Amendment) must be considered.  *See Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 315 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 692 (2024); *see also Davis v. Chorak*, No. 22-1839, 2023 WL 2487339, at *2 (6th Cir. Mar. 14, 2023) ("This distinction matters because while the Fourteenth Amendment protects pretrial detainees, the Eighth Amendment protects convicted prisoners.  And under our caselaw, what violates the Fourteenth Amendment doesn't necessarily violate the Eighth Amendment.  Indeed, pretrial detainees receive different protections because, unlike convicted prisoners, they have "not been adjudged guilty of any crime.") (internal citations omitted).

The record is inconclusive regarding Colemire's status.  For example, state court records show that on May 31, 2022, Colemire was convicted in Campbell County, Kentucky, on a charge

of first-degree possession of a controlled substance (first offense – methamphetamine) and he was sentenced that same day to one year in prison. *See Kentucky Online Offender Lookup,* http://kool.corrections.ky.gov/KOOL/Details/238511 (last visited January 24, 2025); (*see also* R. 23 at Page ID 235). The record does not affirmatively reveal how much time Colemire served for that conviction, but at least some discovery by Colemire suggests he only served 20 percent, which would mean that in November 2022 he was a pretrial detainee being held on the parole violation charges. (*See* R. 23 at Page ID 235 ("21CR00560 Campbell 20% 05/31/2022")). Notably, Defendants follow this characterization of Colemire's status and submit he was a pretrial detainee awaiting adjudication of parole violations and his claims are therefore subject to a Fourteenth Amendment analysis. (*See* R. 41 at Page ID 331).

For his part, during his deposition, Colemire described himself as being "a State inmate" at the time of the allegations in his Complaint. (*See* R. 42 at Page ID 432 (discussing who paid his medical bills)). And, although he does not contest Defendants' characterization of him as a pretrial detainee and submits he was being held for "a probation violation" (*see* R. 46 at Page ID 452), Colemire's briefing relies on Eighth Amendment *and* Fourteenth Amendment case law, which muddies the Court's ability to discern his position on the issue. (*See id.* at Page ID 464-65); *cf. Morgan by next friend Morgan v. Wayne Cnty.*, 33 F.4th 320, 326 (6th Cir. 2022) ("At the time of the alleged assault, Morgan was both a pretrial detainee (on the assault of a prison officer charge) and a convicted prisoner (on the unrelated charge). However, she has pleaded and argued this case solely under the Eighth Amendment standard. We agree with Morgan that under these circumstances, the more demanding Eighth Amendment standard is applicable."). Although the nature of Colemire's custodial status is unclear from the record, as will be discussed below, he has

13

failed to demonstrate that any genuine issue of material fact exists to allow his claims (however viewed) to reach a jury.

### 1.     Failure to Protect

Colemire first claims that jail officials failed to protect him from injury at the hands of Jordan.  (*See* R. 46 at Page ID 463 ("Deputies were warned, asked, and almost virtually begged by Colemire not to be placed inside of Cell 131 with Jordan, but his pleas fell on deaf ears as if they had themselves wanted to see the assault occur.")).  In response to Colemire's failure-to-protect claim, Defendants argue that Colemire cannot succeed on his claim against Jailer Yeary, Deputy Rigdon, Deputy Lennex, or Chief Deputy Curtis because those individuals were not present when Colemire was placed in Cell 131 and that Colemire cannot succeed on his claim against Deputies Monroe, Fulton, Bellew, and Guttridge because the facts presented do not demonstrate a constitutional violation.  (R. 41).

By his own testimony, Colemire disavowed that either Jailer Yeary or Deputy Jailer Curtis was responsible at all for the decision to place him in the cell with Jordan, and he testified that Deputy Rigdon was not present at the time he was moved to the new cell.  (R. 42 at Page ID 380-81, 383).  Thus, as Defendants argue, Colemire has pointed to no evidence that these three Defendants were either present or personally involved in any decision regarding Colemire's placement such that liability could attach to them under § 1983 based on a direct theory of liability or a supervisory liability theory for any constitutional violation.

Colemire challenges this conclusion and argues that the officers "have failed to include their employee work time cards to demonstrate they were not present during the brutal assault where Colemire's jaw was broken" (R. 46 at Page ID 463), but Colemire testified that Jailer Yeary, Deputy Rigdon, and Chief Deputy Curtis were not at the jail at the time.  (R. 42 at Page ID 380-

81, 383).  Further, simply claiming these officers were responsible for training the other officers (*see* R. 46 at Page ID 463) is insufficient to demonstrate *evidence* on which a reasonable juror could find in his favor on a theory of supervisory liability.  *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

Even for Defendants the record shows had some personal involvement in placing Colemire in the cell with Jordan or responding to the altercation (Deputies Monroe, Fulton, Bellew, Guttridge, and Lennex[7]), Colemire cannot point to evidence that creates a genuine dispute of material fact to allow his constitutional claim to reach a jury.  This is true no matter if Colemire is viewed as a convicted prisoner (with claims under the Eighth Amendment) or a pretrial detainee (with claims under the Fourteenth Amendment).

If Colemire were a convicted prisoner, he must show that 1) objectively, he was incarcerated under conditions posing a substantial risk of serious harm, and 2) the officials acted with deliberate indifference to his safety, meaning the officials were subjectively aware of the risk and failed to take reasonable measures to abate it.  *Davis*, 2023 WL 2487339, at *2 (quoting *Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021)).  "In other words, to show an Eighth Amendment violation, he must satisfy a test with 'both an objective and a subjective prong.'"  *Id.* (quoting *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 728 (6th Cir. 2022)).  However, if Colemire

---

[7]    Defendants argue Deputy Lennex was not present during the altercation, but an incident report they filed in the record lists Lennex as the officer who deployed a taser.  (*See* R. 41-4 at Page ID 351; *see also* R. 48 at Page ID 574).  Although this is more removed from the actions of the other officers in the decision to *place* Colemire in the cell with Jordan, the Court finds it easiest to address Lennex's actions in this context.

were a pretrial detainee, "circuit precedent dictates that he need only make an objective showing that an individual defendant acted (or failed to act) deliberately and recklessly." *Id.* (internal quotation marks omitted).

The Court starts with the elements of the Fourteenth Amendment analysis, because if Colemire cannot satisfy this test, any Eighth Amendment theory necessarily fails. *See id.* at *3 ("Because Davis failed to allege that Deputies Tooker and Scavarda violated the Fourteenth Amendment, he necessarily fails the Eighth Amendment's more demanding test as well."). Under Sixth Circuit case law, "a pretrial detainee bringing a failure-to-protect claim against an individual officer must satisfy a four-part test to show a violation of the Fourteenth Amendment." *Id.* First, the detainee must show that 1) the officer made an intentional decision with respect to the conditions under which the plaintiff was confined; 2) those conditions put the plaintiff at a substantial risk of suffering serious harm; 3) the officer failed to take reasonable available measures to abate that risk, and 4) by failing to take such measures, the officer caused the plaintiff's injuries. *Id.* (quoting *Westmoreland*, 29 F.4th at 729).

In this case, there is sufficient evidence on the first element. Colemire testified that Guttridge radioed Monroe about placing him in the cell and that Bellew and Fulton were the officers who transported him to Cell 131. And records show Lennex deployed her taser to control the inmates.

The next elements are where Colemire's claim fails. Consider the evidence regarding the second element, where Colemire must show "a substantial risk of serious harm." For this element, Colemire contends that the officers knew about his "specific situation" and the threat posed to him by being placed in the cell with Jordan. (R. 46 at Page ID 466 (collecting cases)). But although (at least some of the officers including) Guttridge likely heard Jordan's threats, this situation is

16

unlike those presented in cases relied upon by Colemire, including *Walker v. Norris*, where correctional officers failed to timely intervene when an inmate was being chased by another inmate with a knife throughout the prison facility. *Walker v. Norris,* 917 F.2d 1449, 1453 (6th Cir. 1990) ("Here, the jury found that defendants Ritz and Jordan violated Fails' eighth amendment rights by failing to prevent Eggleston from killing Fails. We agree. Viewing the evidence in the light most favorable to the plaintiff, the jury could have concluded that officers Ritz and Jordan had opportunities to prevent the stabbing death: (1) by opening the door to the yard to permit Fails to elude Eggleston; (2) by restraining Eggleston at the door; (3) by shutting the door before Eggleston could follow Fails into the yard; and (4) by intervening when Eggleston attacked Fails in the yard as the guards looked on.") (internal footnote and citation omitted).

Indeed, Colemire himself testified that he did not know why Jordan would have directed officers not to place Colemire in the cell with him and that they had just been in the main cell together, and he also testified that if Jordan had ever threatened him before, "they wouldn't have allowed [Colemire] to be in the cell with [Jordan]." (*See* R. 42 at Page ID 391, 429). This cuts against a finding that Colemire has presented sufficient evidence to reach a jury on the second element of his failure-to-protect claim based on the Fourteenth Amendment. *See Sobin v. Lanham*, No. 4:23-CV-00092-JHM, 2024 WL 3443915, at *8 (W.D. Ky. July 17, 2024) ("Aside from the purported warnings made by Moore immediately before entering cell 503, Plaintiff does not provide any other facts or evidence that would establish his placement with a state inmate created a substantial risk that said inmate would attack him.") (internal record citation omitted); *cf. Reedy*, 988 F.3d at 913 ("Given this context, Hensley's statement to West that 'You guys got to move this motherfucker out of my cell' or 'whatever happens . . . is going to be onto [you],' does not create an objective, substantial risk of harm. If it did, a prison official would be obligated to move any

inmate that uses profanity and threatens that something might happen if his demands for a cell change are not met.").

But even if there is evidence to support a finding that there was a substantial risk to Colemire by placing him in the cell with Jordan, Colemire still has not shown any evidence to support the final two elements. "With respect to the third element, failure to take reasonable measures, Plaintiff must show that the officer was more than merely negligent; the officer must have acted with 'reckless disregard' in the face of an unjustifiably high risk of harm," and "[t]he fourth element is whether the defendant caused the plaintiff's injuries by not taking reasonable measures." *Sobin*, 2024 WL 3443915, at *9 (quoting *Westmoreland*, 29 F.4th at 730) (internal quotation marks omitted). Although Colemire argues the officers' actions went "beyond negligent conduct" (*see* R. 46 at Page ID 464), he has pointed to no *evidence* that would allow a reasonable juror to find any of the officers were more than negligent by placing him in the cell with Jordan. And because the third element is unsatisfied, Colemire also cannot succeed on the fourth. *See Sobin*, 2024 WL 3443915, at *9 ("Because Plaintiff has not established that Defendants failed to take reasonable measures prior to placing Moore into Plaintiff's cell, he cannot establish the causation element of his Fourteenth Amendment failure-to-protect claim.").

In sum, Colemire cannot succeed on his failure-to-protect claim based on the Fourteenth Amendment, which means his Eighth Amendment claim also cannot succeed. *See Davis*, 2023 WL 2487339, at *3. It will therefore be recommended that Defendants' Motion for Summary Judgment be granted as to Colemire's failure-to-protect claim.

### 2. Deliberate Indifference to Serious Medical Needs

Colemire next claims Defendants were deliberately indifferent to his serious medical needs and that he received no medical treatment for nineteen days for his broken jaw. (*See, e.g.*, R. 1;

R. 23).  In response to this claim, Defendants argue they did not fail to provide Colemire with medical attention and there were no violations of his constitutional rights.  (*See* R. 41 at Page ID 342-43).  Again, Colemire's status as either a convicted prisoner or a pretrial detainee at the time of the incident affects which constitutional showing he must make, Eighth Amendment or Fourteenth Amendment.

Here, the Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The United States Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks and citation omitted).  This proscription extends to indifference "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Id*. at 104-05.  To prove this type of claim under 42 U.S.C. § 1983, a plaintiff must show that each defendant acted under color of state law and that each defendant individually was deliberately indifferent to the prisoner's serious medical needs.  *See West v. Atkins*, 487 U.S. 42, 48-49 (1988).

A deliberate indifference claim has two components, one objective, the other subjective.  *Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *Phillips v. Tanglag*, 14 F.4th 524, 534 (6th Cir. 2021).  The objective component requires a plaintiff to demonstrate that his deprivation was "sufficiently serious."  *Farmer*, 511 U.S. at 834.  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (internal quotation marks omitted).  A serious medical need alone

can establish the objective prong if doctors effectively provide no care for it. *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).

"But when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id*. (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005)). A desire for additional or different treatment does not usually support an Eighth Amendment claim, especially when a plaintiff fails to provide expert medical testimony (either through affidavits or depositions) that shows the medical necessity for such treatment. *See Mitchell v. Hiniger*, 553 F. App'x 602, 605 (6th Cir. 2014); *Anthony v. Swanson*, 701 F. App'x 460, 463-64 (6th Cir. 2017). The Sixth Circuit has regularly rejected Eighth Amendment claims based on adequacy of treatment when the plaintiff has failed to present expert medical evidence that the treatment was inadequate. *See, e.g.*, *Phillips*, 14 F.4th at 535.

The subjective component requires a plaintiff to demonstrate that the defendant had a "sufficiently culpable state of mind" in denying medical care. *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). Relevant here, the subjective component "requires a plaintiff to show that a defendant knew of and disregarded an excessive risk to inmate health or safety," meaning "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Helphenstine*, 60 F.4th at 315 (cleaned up); *see also Farmer*, 511 U.S. at 837.

As for the Fourteenth Amendment, until recently, courts "analyzed both pretrial detainees' and prisoners' claims of deliberate indifference under the same rubric." *Helphenstine*, 60 F.4th at 315 (internal quotation marks omitted). However, case law now directs that a Fourteenth

Amendment deliberate indifference claim requires courts "to lower the subjective component from actual knowledge to recklessness." *Id.* at 316. Thus, for a deliberate indifference claim brought under the Fourteenth Amendment, a plaintiff must show 1) that he had a sufficiently serious medical need and 2) that each defendant acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. *Id.* at 317.

On this record, Colemire's deliberate indifference claim fails whether viewed under the Eighth Amendment or Fourteenth Amendment because he has pointed to no evidence demonstrating a genuine issue of material fact as to the second element of either claim. In other words, he cannot show the officers either knew of and disregarded an excessive risk to his health or safety (under the Eighth Amendment) or acted deliberately and also recklessly in the face of an unjustifiably high risk of known (or should be known) harm (under the Fourteenth Amendment).

Although Colemire broadly alleges that he was denied medical treatment for nineteen days between when he was attacked and when he ultimately had surgery on his jaw at the University of Kentucky Medical Center, the record contains ample evidence to the contrary. To be sure, as discussed in the fact section above, the record details how jail staff promptly acted to diagnose and treat Colemire's jaw injury, including seeking outside help to do so. Indeed, Colemire himself testified to, and the record contains other evidence of: the responsiveness of the jail nurse to quickly order x-rays; the imaging that occurred for Colemire; the treatment he received while awaiting surgery, including being given medicine for inflammation and being placed on a soft diet; and the outside treatment he received, which ultimately culminated in surgery. (*See, e.g.*, R. 42 at Page ID 408-11; R. 23-1 at Page ID 250, 263-65).

21

Although Colemire (understandably) may wish that the time between his injury and his surgery was of a lesser duration, he has not pointed to evidence demonstrating any Defendant had a requisite state of mind to be held liable for a claim of deliberate indifference to his serious medical needs for failing to obtain treatment for his jaw. It will therefore be recommended that Defendants' Motion for Summary Judgment also be granted as to this claim.

### C.    Qualified Immunity

Finally, Defendants argue (in the alternative) that they are entitled to qualified immunity for both of Colemire's claims. (*See* R. 41 at Page ID 341-42, 344). "Qualified immunity shields public officials from personal liability under § 1983 unless they 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Helphenstine*, 60 F.4th at 326 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In other words, "[o]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (quoting *D.C. v. Wesby*, 583 U.S. 48, 62-63 (2018)).

In this case, for the reasons discussed above, Colemire has not demonstrated any genuine issues of material fact exist to allow him to reach a jury on his constitutional claims. Defendants are therefore entitled to qualified immunity in this action. *See Helphenstine*, 60 F.4th at 326 ("The inquiry is simple for defendants Byard and Lucas. Having concluded above that their conduct did not rise to the level of deliberate indifference, they are entitled to qualified immunity because they did not violate Helphenstine's constitutional rights."); *see also Davis*, 2023 WL 2487339, at *3 ("Since Davis doesn't allege a constitutional violation, the deputies are entitled to qualified immunity, and the district court properly granted their motion to dismiss.").

## V.    CONCLUSION AND RECOMMENDATIONS

For the reasons stated herein, **IT IS RECOMMENDED** that:

1)    Defendants' Motion for Summary Judgment (R. 41) **be granted** and Colemire's claims against Defendants **be dismissed with prejudice**; and

2)    this civil action **be stricken** from the active docket of the Court.

The parties are directed to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Report and Recommendation, issued under subsection (b) of the statute. Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Judge. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Judge and the Sixth Circuit Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

Signed this 27th day of January, 2025.



Signed By:
*Candace J. Smith*
United States Magistrate Judge

G:\Judge-CJS\DATA\Orders\civil cov\2023\23-134-DCR Colemire R&R.docx

23